Ernest W. BUNZ, Appellee,

v.

MOVING PICTURE MACHINE OPERA-
TORS' PROTECTIVE UNION
LOCAL 224, Appellant.

No. 76–1599.

United States Court of Appeals,
District of Columbia Circuit.

Argued 3 Oct. 1977.

Decided 16 Nov. 1977.

Michael Wolf, New York City, with whom Ronald Rosenberg and George B. Driesen, Washington, D. C., were on the brief, for appellant.

Philip F. Hudock, McLean, Va., for appellee.

Before BAZELON, Chief Judge, and TAMM and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

WILKEY, Circuit Judge:

The question presented in this case is whether the federal courts have jurisdic-

tion of a union member's claim that he was denied the "equal right to vote" guaranteed by the Landrum-Griffin Act[1] when his union conducted a referendum in plain disregard of its by-laws. We conclude that the District Court properly took jurisdiction, and affirm its judgment on the merits.

## FACTS

Plaintiff Bunz is a member of the Moving Picture Machine Operators' Protective Union Local 224, a District of Columbia labor organization. During a strike, the officers of Local 224 determined to impose an assessment of $50 per month on any member who did not walk the picket line. The assessment was initiated on 19 May 1975; contrary to provisions of the Landrum-Griffin Act,[2] however, the referendum authorizing the assessment was conducted by standing vote,[3] rather than by secret ballot. In response to a complaint by the plaintiff, the picket assessment was resubmitted to the membership and a secret ballot vote thereon was held on 30 June 1975. Fifty-nine per cent of the members present voted for the assessment. The local's by-laws required that assessments be approved by two-thirds of the members present.[4] The

local's attorney nevertheless ruled that the assessment had passed, arguing that the two-thirds provision was invalid because it conflicted with § 101(a)(3) of the Landrum-Griffin Act, which provides that no special assessment shall be levied "except . . . by majority vote."[5] Pursuant to this ruling, Local 224 has charged and collected the $50 picket assessment continuously since 19 May 1975.

 After exhausting internal union remedies, Bunz brought suit in federal district court, alleging improper implementation of the picket assessment. The parties joined issue on the validity of the two-thirds provision and on the propriety of awarding attorneys' fees. In a well-reasoned opinion, District Judge Gasch granted plaintiff's motion for summary judgment.[6] The court concluded that the "majority vote" provision of § 101(a)(3) establishes only a *minimum* requirement, and leaves a union free to enact more stringent rules for approval of assessments.[7] Judge Gasch also concluded that Local 224 was required to reimburse the plaintiff for his attorneys' fees under the "common benefit" doctrine of *Hall v. Cole*.[8] Judge Gasch's opinion was

1. Section 101 of the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act), 29 U.S.C. § 411 (1970), establishes a "bill of rights" for union members. Union members are guaranteed the rights of speech and assembly, and the right to participate fully and freely in the union's internal affairs.

2. 29 U.S.C. § 411(a)(3) (1970):
 . . . [T]he rates of dues and initiation fees payable by members of any labor organization . . . shall not be increased, and no general or special assessment shall be levied upon such members, except—
 (A) in the case of a local labor organization, (i) by majority vote *by secret ballot* of the members in good standing voting at a general or special membership meeting, . . or (ii) by majority vote of the members in good standing voting in a membership referendum conducted *by secret ballot* . . . . .
 (Emphasis added).

3. Appendix (App.) 47.

4. By-laws of Moving Picture Machine Operators' Protective Union Local 224, art. vi, § 4, *reprinted in* App. 48: "Assessments can be

levied only on a two-thirds vote of the members present."

5. 29 U.S.C. § 411(a)(3) (1970), *quoted in* note 2 *supra.*

6. Judge Gasch's Memorandum-Order, filed 30 April 1976, is reprinted in App. 46–52.

7. *Id.* 49–50.

8. *Id.* 50–51, *citing* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). In *Hall v. Cole*, plaintiff alleged that his expulsion from the union violated his right of free speech secured by Landrum-Griffin Act § 101(a)(2), 29 U.S.C. § 411(a)(2) (1970). The Court held that in vindicating his own right of free speech plaintiff "necessarily rendered a substantial service to his union as an institution and to all of its members," 412 U.S. at 8, 93 S.Ct. at 1948; reimbursement of his attorneys' fees out of the union treasury was justified because it "simply shift[ed] the costs of litigation to "the class that has benefited from them and that would have had to pay them had it brought the suit.'" *Id.* at 8–9, 93 S.Ct. at 1948, *quoting Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 397, 90

in all respects correct and is affirmed with regard to the two issues with which it dealt.

 The only serious question raised on appeal is whether the District Court had subject-matter jurisdiction of the suit.[9] Neither party in the trial court put this matter in issue.[10]

## ANALYSIS

 Landrum-Griffin Act § 102 gives the district courts jurisdiction of civil actions brought by "[a]ny person whose rights secured by provisions of [the Act] have been infringed by any violation of [the Act] . . . ."[11] In accordance with this section, the courts have consistently held that a union's violation of its constitution or by-laws "does not *per se* amount to a violation" of the Landrum-Griffin Act,[12] and that the federal courts "do not possess jurisdiction to enforce union constitutions and by-laws where there has been no violation of a specific right enunciated in [§ 101(a) of the Act]."[13] In this case, Bunz cannot base federal jurisdiction on a violation of any right enunciated in the "dues and assessments" provision of § 101(a)(3). That section merely gives him the right that "no . . . assessment shall be levied . . . except . . . by majority vote,"[14] and Local 224 did not deny him that right when it ignored the two-thirds provision of its by-laws.[15] If Bunz is to prevail, therefore, he must be able to predicate jurisdiction on a violation of a specific right enunciated in § 101(a)(1).

 Section 101(a)(1) states that "[e]very member of a labor organization shall have equal rights . . . to vote in elections or referendums . . . , subject to reasonable rules and regulations in such organization's constitution and bylaws."[16] In order to ascertain whether the union's conduct in this case deprived Bunz of his equal right to vote, it is necessary to elaborate what the "equal right to vote" impli-

S.Ct. 616, 24 L.Ed.2d 593 (1970). *See Yablonski v. UMW*, 151 U.S.App.D.C. 253, 275, 466 F.2d 424, 431 (1972), *cert. denied*, 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973). *Hall* was cited with approval in *Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 421 U.S. 240, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

9. The union also contends that the District Court failed to consider material facts regarding plaintiff's exhaustion of internal union remedies, and thus improperly awarded summary judgment. This contention, raised for the first time on appeal, is frivolous. Landrum-Griffin Act § 101(a)(4) permits unions to require their members to exhaust internal remedies for up to four months before suing the union. 29 U.S.C. § 411(a)(4) (1970). In Paragraph 46 of his complaint, Bunz alleged that he had "spent in excess of four months in exhausting his administrative remedies before the Local and International and therefore complied with all conditions precedent to institution of this suit as set forth in Sec. 101(a)(4) . . . ." App. 12. In its answer, Local 224 "admit[ted] the allegations of Paragraph 46." App. 17. In its Opposition to plaintiff's motion for summary judgment, Local 224 listed five reasons why the motion should be denied; failure to exhaust union remedies was not alleged. App. 36–37. Indeed, the union allowed that "the sole issue in this case is whether the vote on the $50.00 assessment is controlled by a simple majority . . . ." App. 38. Our review of the record makes plain that there existed no issue of fact regarding plaintiff's exhaustion of internal union remedies.

10. Local 224's failure to raise jurisdiction as a defense does not of course constitute a waiver. Fed.R.Civ.P. 12(h)(3); J. Moore, 2A Federal Practice (Supp.1977) ¶ 12.23 at 188–90 n. 17 (citing cases).

11. 28 U.S.C. § 412 (1970).

12. *Ritz v. O'Donnell*, 413 F.Supp. 1365, 1370 (D.D.C.1976), *aff'd on other grounds*, 185 U.S. App.D.C. ——, 566 F.2d 731 (Sept. 1977). (citing cases).

13. *McGovern v. New Orleans Clerks Local 1497*, 343 F.Supp. 351, 352 (E.D.La.), *aff'd per curiam*, 463 F.2d 423 (5th Cir. 1972) (citing cases). *Accord, Birthwright v. Karsch*, 413 F.Supp. 119, 121 & n. 7 (S.D.N.Y.1976) (Weinfeld, J.) (citing cases).

14. 29 U.S.C. § 411(a)(3) (1970), *quoted in* note 2 *supra*.

15. *Accord, McGovern v. New Orleans Clerks Local 1497*, 343 F.Supp. 351 (E.D.La.), *aff'd per curiam*, 463 F.2d 423 (5th Cir. 1972).

16. 29 U.S.C. § 101(a)(1) (1970).

cates.[17] The Supreme Court has described § 101(a)(1) as "a command that members and classes of members *shall not be discriminated against* in their right to nominate and vote."[18] A union's discrimination against its members is most obvious, of course, when it denies some of them the right to vote outright.[19] However, a union cannot immunize itself against charges of discrimination simply by affording each member the "mere naked right to cast a ballot;"[20] the right each member has to vote must be "meaningful."[21] Accordingly, the courts have found that the "equal right to vote" was denied, notwithstanding universal suffrage, where union officials circulated inadequate or misleading information about matters to be voted upon;[22] where union officials refused to provide opponents access to a membership mailing list;[23] where ballots were submitted to members in unsuitable form;[24] where irregularities

---

**17.** Both in brief and in oral argument, plaintiff laid great stress on the phrase "subject to reasonable rules and regulations in such organization's constitution and by-laws," and argued that it "more clearly *defines*" the "equal right to vote" that § 101(a)(1) grants. Brief of Appellee at 13–14, *citing Young v. Hayes*, 195 F.Supp. 911, 917 (D.D.C.1961). Bunz contends, in other words, that this *proviso* effectively *directs* the union to conduct its referenda in a particular manner, *i. e.,* in accordance with its constitution and by-laws, and that if the union fails to do so it *ipso facto* violates the Act. Brief of Appellee at 14, *citing Stettner v. International Printing Pressmen*, 278 F.Supp. 675, 678 (E.D.Tenn.1967). This construction of the *proviso* is illogical. The "subject to" clause was designed not to elaborate or "define" the "equal right to vote," but rather to permit its limitation. The *proviso* says that a union can enact rules and regulations restricting its members' right to vote without thereby infringing their "equal rights," provided those rules and regulations are reasonable; the *proviso* does not say that a union must enforce and abide by every electoral rule it has seen fit to make. If the *proviso* means what Bunz says it means, federal courts would have jurisdiction to enforce union constitutions and by-laws across the board. The courts have consistently rejected this argument. *See* notes 12–13 *supra*.

**18.** *Calhoon v. Harvey*, 379 U.S. 134, 139, 85 S.Ct. 292, 295, 13 L.Ed.2d 190 (1964) (emphasis added). *Accord, Acker v. Locomotive Engineers*, 95 L.R.R.M. 2327 (D.Minn.1977); *Keck v. Employees Indep. Ass'n*, 387 F.Supp. 241, 247 (E.D.Pa.1974) (despite violation of union by-laws, no violation of § 101 because "plaintiffs do not allege that members or classes have been discriminated against in their right to vote").

**19.** *E. g., Trail v. International Bhd. of Teamsters*, 542 F.2d 961 (6th Cir. 1976) (denial of equal right to vote where contract not submitted to members for ratification, contrary to union by-law); *1199 DC, Nat'l U. of Hosp. & Health Care Employees v. Nat'l U. of Hosp. & Health Care Employees*, 175 U.S.App.D.C. 70, 72, 74, 533 F.2d 1205, 1207, 1209 (1976) (district court had subject-matter jurisdiction of member's claim that union's failure to submit merger to vote denied him right to vote in accordance with constitutional provision that transfer was "subject to approval of members involved"); *Thomas v. UMW*, 422 F.Supp. 1111, 1117 (D.D.C.1976) (Sirica, J.).

**20.** *Young v. Hayes*, 195 F.Supp. 911, 916 (D.D.C.1961).

**21.** *Blanchard v. Johnson*, 388 F.Supp. 208, 213–14, 216 (N.D.Ohio 1975), *aff'd in relevant part*, 532 F.2d 1074 (5th Cir. 1976); *Sertic v. Cuyahoga Carpenters Dist. Council*, 423 F.2d 515, 521 (6th Cir. 1970); *Pignotti v. Local 3, Sheet Metal Workers*, 343 F.Supp. 236, 242–43 (D.Neb.1972), *aff'd*, 477 F.2d 825 (8th Cir.), *cert. denied*, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973).

**22.** *Blanchard v. Johnson*, 388 F.Supp. 208, 213–14, 216 (N.D.Ohio 1975), *aff'd in relevant part*, 532 F.2d 1074 (5th Cir. 1976) ("meaningful vote" requires that "lines of communication among the membership be as unfettered as reason can make them;" equal right to vote denied when officers failed to keep members informed, contrary to provisions in union constitution); *Young v. Hayes,* 195 F.Supp. 911, 916–17 (D.D.C.1961) (equal right to vote denied when members were misinformed about proposals).

**23.** *Sheldon v. O'Callaghan*, 497 F.2d 1276, 1282–83 & n. 9 (2d Cir.), *cert. denied*, 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974).

**24.** *Miller v. Utility Constr. Union*, 89 L.R.R.M. 2897 (S.D.Ohio 1975) (equal right to vote denied when "form of ballot and method of conducting the election" were not in keeping with union's by-laws); *Rothstein v. Manuti*, 235 F.Supp. 39, 45 (S.D.N.Y.1963) (equal right to vote "embraces right to have referendum submitted in suitable form" by having separate votes on separate questions) (dictum); *Young v. Hayes*, 195 F.Supp. 911, 916–17 (D.D.C.1961) (equal right to vote denied when members not permitted to vote on proposals separately, in violation of union's constitution and by-laws).

occurred in counting ballots;[25] and where union officials refused to implement the result of a properly-conducted vote.[26] Evidently, the equal right to vote may be denied upon the occurrence of serious discrimination, irregularities, or foul play at any stage of the electoral process. ·

Proceeding upon this case law, it seems clear that Local 224 discriminated against Bunz by depriving him of his equal right to cast a meaningful vote. Like other members who opposed the assessment, Bunz was allowed to cast a ballot; yet the minority's ballots were deprived of their effectiveness when the union, by issuing a patently frivolous interpretation of its constitution, raised the percentage of votes required to defeat the assessment from 34% to 51%. In so doing, the officers plainly discriminated against the minority, who opposed the assessment, and aligned themselves with the majority, for the obvious reason that the majority backed the officers' policy. Because the union thus deprived Bunz of his "equal right to vote" secured by § 101(a)(1), the court below had jurisdiction under § 102.

The only significant argument against this conclusion would be based on language in a series of Second Circuit cases, stressed by appellant. These cases suggest that § 101(a)(1) is violated only when the union's discrimination is evidenced by a more direct attack on the right to vote than occurred here. In *Robins v. Rarback*,[27] plaintiff urged the court to "construe the language of [§ 101(a)(1)] as granting authority to the federal courts to control and direct the entire conduct of union elections on the theory that the right to vote is a right to cast an 'effective' vote, and that a vote cannot be effective unless the election is properly conducted in all its aspects." Although the court actually disposed of the case on other grounds, it said in dictum that it "would be reluctant to hold that such a simple guaranty of the equal right to vote would carry with it the broad implications with which the plaintiff would freight it."[28] In *Gurton v. Arons*,[29] Judge Lumbard framed the "difficult question presented [as] whether the equal right to vote guaranteed by § 101(a)(1) is infringed if union officers, acting without justification from the union bylaws, void the result of a properly-conducted vote."[30] Judge Lumbard drew from *Calhoon v. Harvey*[31] "the more general principle that § 101(a)(1) protects the right to vote only against relatively direct attack," and "reluctantly conclude[d] . . . that the more indirect attack involved in this case—arbitrarily voiding the result of a vote after it is taken—does not infringe the rights of the plaintiffs under § 101(a)(1)."[32]

**25.** *Stettner v. International Printing Pressmen*, 278 F.Supp. 675, 677–78 (E.D.Tenn.1967) (irregularities in counting ballots and deviations from union rules in conducting referendum discriminated against plaintiffs and diluted their equal right to vote).

**26.** *Pignotti v. Local 3, Sheet Metal Workers*, 343 F.Supp. 236, 242–43 (D.Neb.1972), aff'd, 477 F.2d 825 (8th Cir.), cert. denied, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973) (repeated calls of new votes after members had defeated motion, and refusal to implement their negative vote, denied members' rights "to [have] an equal right to vote and to have that vote be meaningful").

**27.** 325 F.2d 929, 930 (2d Cir. 1963).

**28.** *Id.*

**29.** 339 F.2d 371 (2d Cir. 1964).

**30.** *Id* at 377 (Lumbard, C. J., concurring).

**31.** 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). In *Calhoon*, the Court held that union members cannot bring post-election suits challenging union officer elections under § 101(a)(1), since Title IV of the Act, 29 U.S.C. §§ 481–83 (1970), contains exhaustive provisions governing such elections. *Calhoon* does not apply to the instant case, because the instant case does not involve an election of officers.

**32.** 339 F.2d at 377. This approach apparently was reaffirmed in *Fritsch v. District Council No. 9, Bhd. of Painters*, 493 F.2d 1061 (2d Cir. 1974). In that case, group A locals contended that their voting rights were diluted because group B locals were allowed to vote for group A's collective bargaining representative, whereas group A was not allowed the reciprocal right to vote for group B's representative. The court concluded that "the attack on plaintiffs' voting rights [was] in fact far from direct," *id.* at 1063 n. 5, and that the district court consequently lacked jurisdiction. As long as plaintiffs do not

We believe that the language of these opinions does not defeat jurisdiction in the present case, for three reasons. First, the narrow approach to the "equal right to vote" that these decisions manifest has not been consistently followed even in the Second Circuit. The language in *Robins* was dictum, and provoked strong words from Judge Waterman in concurrence.[33] Later decisions, moreover, have adopted a more liberal approach. In *Navarro v. Gannon*,[34] the court held that "the guaranty in Section 101(a)(1) of the equal right to participate in the deliberations and voting at union meetings . . . necessarily encompass[es] the right to assemble, consult and decide matters of concern to the local union without the inhibiting presence and control by international officials."[35] Although the attack on members' rights in *Navarro* seemed rather indirect, the court distinguished *Gurton*, somewhat halfheartedly, on the ground that *Gurton* involved a "threat . . . to [members'] voting rights," whereas *Navarro* involved "a threatened invasion of the members' right of free discussion."[36] In *Sheldon v. O'Callaghan*,[37] the Second Circuit again distinguished *Gurton* and held that "union officials' stiff-necked refusal even to provide

their opponents access to the membership mailing list rendered the referendum procedure so patently unfair that their conduct can fairly be deemed 'a denial of the [members'] equal right to vote . . . .'"[38] In *Fritsch v. District Council No. 9, Brotherhood of Painters*,[39] Judge Feinberg noted that uncertainty over the meaning of "equal voting rights" had generated inconsistent holdings among district courts in the Circuit.[40] At least one other Circuit, finally, has indicated its belief that the language of *Gurton* goes too far.[41]

The second reason for rejecting *Gurton's* narrow approach is that the policy concerns that animated it have to some extent been eroded. In holding that the federal courts lacked jurisdiction, the Second Circuit relied heavily on the policy, enunciated in *Calhoon v. Harvey*,[42] of avoiding interference into internal union affairs.[43] In *Calhoon*, the Court held that union members cannot bring post-election suits challenging officer elections under the "equal rights" clause of § 101(a)(1), since that would permit members to evade the elaborate provisions governing such elections contained in Title IV of the Act.[44] Title IV gives the Secretary of Labor exclusive power to sue in case of election irregularities, in order that he may

---

claim "that they have been totally denied the right to vote" or that "the votes of some members count more than the votes of others," § 101(a)(1) "does not require a district court to enforce the 'one-man-one-vote' rule in the sense urged here." *Id.* at 1063 (footnote omitted).

**33.** 325 F.2d at 932 (Waterman, J., concurring):
If the right to vote guaranteed by Section 101(a)(1) is to be at all meaningful the section must be regarded as demanding more than a simple provision in a union's constitution or by-laws formally stating that all members are entitled to cast a ballot. The majority's interpretation of this section, if my assessment of it is correct, reduces the guarantee of the right to vote to little more than this.

**34.** 385 F.2d 512 (2d Cir. 1967), *cert. denied*, 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968).

**35.** *Id.* at 518.

**36.** *Id.* at 520.

**37.** 497 F.2d 1276 (2d Cir.), *cert. denied*, 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974).

**38.** *Id.* at 1283 n. 9, *quoting Gurton v. Arons*, 339 F.2d at 374.

**39.** 493 F.2d 1061 (2d Cir. 1974).

**40.** *Id.* at 1063 n. 5.

**41.** *See Sabolsky v. Budzanoski*, 457 F.2d 1245, 1251 (3d Cir. 1972) ("[t]o the extent that [*Gurton*] *over-emphasizes* the danger of judicial intervention in union affairs, we decline to follow it") (emphasis original) (footnote omitted).

**42.** 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). *See note 31 supra.*

**43.** *See, e. g., Fritsch v. District Council No. 9, Bhd. of Painters*, 493 F.2d 1061, 1063 (2d Cir. 1974); *Gurton v. Arons*, 339 F.2d 371, 374–75 (2d Cir. 1964); *id.* at 377 (Lumbard, C. J., concurring). *Cf. Robins v. Rarback*, 325 F.2d 929, 930–31 (2d Cir. 1963) (pre-*Calhoon*).

**44.** 29 U.S.C. §§ 481–83 (1970).

"screen out" frivolous suits against unions and thus avoid undue disruption of union affairs.[45] This policy of non-interference, however, has been considerably eroded by the Court's recent decisions in *Trbovich v. UMW*[46] and *Dunlop v. Bachowski*.[47] *Trbovich* said that the complaining union member can intervene in the Secretary's suit; *Bachowski* said that he can get judicial review if the Secretary refuses to sue. These decisions plainly evince greater solicitude for aggrieved union members, and invite greater harassment of offending unions;[48] in so doing, they undercut *Calhoon's* policy of non-interference, and *pro tanto* the vitality of the *Gurton* approach.

 Third, even if the policy of non-interference retained its pristine vigor, the risks of interference are minimal in the present case. The federal courts have been reluctant to take jurisdiction when it would require them "to control and direct the entire conduct of union elections;"[49] when they would have to "examine into whether [union] by-laws were lawfully adopted or repealed,"[50] or determine whether those by-laws were valid.[51] In the present case, by contrast, the union's two-thirds provision is obviously valid, and the union has obviously ignored it. There is here no need for construction or interpretation, no prospect of

"in-depth intervention into internal union affairs."[52] The federal court here need do no more than tell the union to play by its own rules.[53]

For these reasons, we find the language in the *Gurton* line of cases unpersuasive, at least on the facts of this case. In holding that the district court had jurisdiction of Bunz's suit, moreover, we are not unmindful of certain equitable considerations. Local 224 has flagrantly breached its "contract" with its members. Yet to condemn Bunz to a breach-of-contract suit in state court may well be to condemn him to no remedy at all.[54] The judgment of the court below accordingly is

*Affirmed.*

---

45. See Note, Dunlop v. Bachowski *and the Limits of Judicial Review under Title IV of the LMRDA: A Proposal for Administrative Reform*, 86 Yale L.J. 885, 890–91 (1977).

46. 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972).

47. 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975).

48. *See* Note, *supra* note 45 at 886–87, 890–96.

49. *Robins v. Rarback*, 325 F.2d 929, 930 (2d Cir. 1963).

50. *Gurton v. Arons*, 339 F.2d 371, 374 (2d Cir. 1964).

51. *E. g., McGovern v. New Orleans Clerks Local 1497*, 343 F.Supp. 351, 352 (E.D.La.) aff'd per curiam, 463 F.2d 423 (5th Cir. 1972).

52. *Id.,* quoting Beaird, *Some Aspects of the LMRDA "Bill of Rights,"* 5 Ga.L.Rev. 661, 662 (1971).

53. This is not to say, of course, that every time a union breaks its rules it thereby violates § 101(a)(1). *See* notes 12–13 & 17 *supra* and accompanying text. The existence of a violation depends on whether, under all the circumstances of the case, the union has discriminated against some of its members and robbed their votes of meaning. But in making this determination the court will naturally consider whether the union has flouted its rules; the egregiousness of the violation, if any; the bad faith in which the violation occurred; and the impact of the violation on the election's outcome.

54. At least one commentator has observed that state courts have not demonstrated great solicitude for workers' rights in suits of this sort. *See* Wellington, *Union Fines and Workers' Rights*, 85 Yale L.J. 1023, 1034–37 (1976) (noting the cursory treatment state courts have accorded union members' challenges to "unreasonable" union fines on breach-of-contract grounds).